WALTER S. DICKEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11637. Promulgated January 15, 1929.

*Maurice H. Winger, Esq.*, and *Alton Gumbiner, Esq.*, for the petitioner.

*Orris Bennett, Esq.*, for the respondent.

OPINION.

SMITH: The first question presented is whether petitioner derived any taxable income in 1920 from the syndicate transaction or joint adventure in which the petitioner invested $60,000 in 1912. Petitioner contends that he did not, first, for the reason that the total amount received from the syndicate was less than the fair market value of his interest in the syndicate on March 1, 1913, and, secondly, for the reason that if any taxable income was realized from the transaction it was realized by him prior to 1920.

The petitioner received from the syndicate up to January 2, 1920, inclusive, $372,454.88. He claims that the March 1, 1913, fair market value of his interest was $388,016.37. In support of this contention he has submitted voluminous evidence in the form of balance sheets of "Syndicate G" and the Telephone Securities Co., a consolidated balance sheet of these two, and a comparative table of earnings of the Home Telephone Co. From a careful study of this evidence we are of the opinion that it does not establish a "fair market value" of the petitioner's interest in the syndicate at March 1, 1913, of $388,016.37. The syndicate acquired its stock in the Kansas City Home Telephone Co. at a fair price and apparently in order to acquire control of the company paid a comparatively high price for the stock. The consolidated balance sheet of the Telephone Securities Co. and "Syndicate G" at February 28, 1913, shows an adjusted surplus for the syndicate of only $91,874.43. The book value of the combined interests of the members of the syndicate at February 28, 1913, was $271,874.43. The petitioner has adduced no evidence that the assets of the syndicate at March 1, 1913, could have been sold in excess of their book value. We have found, therefore, that the fair market value of the petitioner's interest in the syndicate on March 1, 1913, was $90,624.81, or one-third of the total.

The evidence establishes that it was the hope of the syndicate that the outstanding shares of stock of the K. C. Home Telephone Co. could be acquired at a reasonable price; that economies could be effected in the operations of the company; that the business of the company could be greatly expanded; and that the company could eventually be sold to the Bell interests at a good profit. These anticipations of the syndicate were realized.

On July 16, 1919, petitioner received $153,854.88 from the syndicate and on January 2, 1920, an additional amount of $100,000. In his income-tax returns the petitioner reported no income from the receipt of these payments in either of the years 1919 or 1920. The respondent has added to the net income reported by the petitioner for 1920 the $100,000 paid to him on January 2, 1920. The petitioner contends that if this $100,000 received by him on January 2, 1920, was income at all, it was income of the year 1919 and not of the year 1920. This claim is predicated upon the proposition that the syndicate was not a taxable entity; that the syndicate manager or agent received the income in 1919 and that the receipt of the income by the syndicate manager in 1919 constituted a receipt by the petitioner. The petitioner alleges that his books of account were kept upon the accrual basis. We consider, however, that this question is immaterial. The record does not show whether the petitioner took up on his books of account the $100,000 received on January 2, 1920, in 1919 or in 1920. The Revenue Act of 1918 taxes as entities corporations or associations and individuals. The members of a partnership are required to include in their individual returns the distributable profits of a partnership regardless of whether such profits are actually paid to them by the partnership in the taxable year. Petitioner argues that the syndicate should be considered and treated the same as a partnership. In support of this contention the petitioner cites the decision of the Board in *Ferry Market, Inc.*, 5 B. T. A. 167. The facts in that case show a joint adventure in connection with the ownership of two steam schooners, the petitioner owning an undivided two one-hundreths interest in each. There were several coowners, one of which was the manager. In the course of that opinion we stated:

The petitioner contends that it should include in gross income for the taxable year only amounts of the distributive net earnings of the vessels of which it is one of several co-owners that it actually received. The Commissioner has held that the entire annual distributive earnings of such vessels should be included in the gross income of the individual co-owners, even though a part of such earnings is retained by the managing owner as a reserve for use in future operations.

We are of the opinion that the managing owner of a vessel jointly owned by several co-owners is the agent of such co-owners and that net earnings received by him must be regarded as received by the several co-owners in the proportion of their interests in such vessel. While the co-ownership of a vessel does not constitute a partnership or a joint stock association, it does result in the creation of an operating entity that earns income by the use of capital. Such income is taxable.

The respondent contends that the above mentioned case is readily distinguishable from this one for the reason that—

\* \* \* there the interested parties were not found by the Board to be joint adventurers but co-owners engaged in the actual operation of a continuing business created as an operating entity that earns income from year to year by the use of capital, whereas, here we have parties engaged in a specific joint venture—the purchase and sale of a certain telephone company. \* \* \*

We do not perceive the validity of the distinction sought to be made. The petitioner was a coowner with the other two members of the syndicate of the assets of the syndicate. The syndicate was not a taxable entity. The receipt of income by the syndicate was receipt of income by the coowners. The syndicate sold $750,000 par value of bonds in 1919 and received cash for them. The syndicate had no accounts or bills payable at the close of 1919. All of the income of the syndicate in 1919 was income of the members of the syndicate in that year and not in the year 1920. The contention of the petitioner that the $100,000 cash received by him in 1920 was not taxable income in 1920 is therefore sustained.

The petitioner contends that under date of January 10, 1917, he sold and conveyed to the Ontario Realty Co., a corporation of which he owned all or substantially all of the stock, 2,962.95 acres of land containing clay deposits for a cash consideration of $335,507.28 and an agreement on the part of the vendee to pay two-thirds of the gross income from those lands to Kate L. Dickey, his wife, and to Madeline A. Dickey, Catherine Dickey, and William Laurence Dickkey, his daughters and son, in equal shares during their lifetime and upon the death of any one or more of said parties the share of such income payable to such deceased person or persons to be paid to the petitioner or on his order, such payments to continue until the clay deposits on the lands should be exhausted; that the arrangement above outlined " was a bona fide gift of a right to receive said income, and that from and after the completion of said arrangement the taxpayer had no right, title or interest in or to said income or any part thereof."

It is the respondent's contention that the transaction could have constituted nothing more than an oral, revocable, unenforceable promise to give to petitioner's wife and children a part of his future income after he had acquired it.

Upon the point as to whether the petitioner sold the clay lands in question to the Ontario Realty Co. in 1917, the respondent submits that the evidence clearly shows that the transaction "has never been considered or treated as a sale by the interested parties." We can not doubt, however, from the pleadings, the fact of the conveyance of the clay lands in question to the Ontario Realty Co. in 1917. The answer of the respondent admits the transfer and the receipt by the petitioner of the cash consideration of $335,507.28.

The evidence indicates that at a date shortly subsequent to January 10, 1917, the petitioner orally agreed to pay to the Ontario Realty Co. for the clay that he might take from the lands $1 per ton burned weight. The petitioner was apparently the president of the Ontario Realty Co. in 1917. The income-tax return filed for that company shows Fred L. Dickey as vice president and George H. Davis as treasurer. The petitioner testified that he did not vote at the stockholders' or directors' meetings at which the Ontario Realty Co. agreed to receive the clay lands from the petitioner. We can not doubt, however, from the facts in the case that the oral agreement made by the petitioner with the Ontario Realty Co. (made virtually by the petitioner with himself) was made without any regard to the fair market price of the clay to be sold by the Ontario Realty Co. to the petitioner.

The evidence indicates that the price of $1 per ton burned weight was grossly in excess of the ordinary royalty payable for clay; that a fair royalty would have been from 7 to 15 cents per ton if the clay had been taken from undeveloped clay lands. Under the agreement the petitioner was to bear all of the expense of removing the clay from the lands of the Ontario Realty Co., and there is no evidence of record which convinces us that a fair price for the clay was in excess of the amount allowed by the respondent.

Under the taxing statute the petitioner is entitled to deduct from gross income " all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." (Section 214(a) of the Revenue Acts of 1918 and 1921.) The respondent has allowed the petitioner to deduct from gross income 33⅓ cents per ton for all of the clay taken from the Ontario Realty Co.'s lands, and this represents the entire amount of money paid to the Ontario Realty Co. by the petitioner for the clay removed. The balance of the orally agreed payments was credited upon the petitioner's books of account to the petitioner's wife and three children in equal shares during the lifetime of the petitioner's wife, and after the death of the petitioner's wife the balance of the payments which the Ontario Realty Co. would have paid, under the oral agreement, to the petitioner's three children was credited by petitioner upon his books of account directly to the children. We are of the opinion that the credits made by the petitioner upon his books of account to his wife and three children were not ordinary and necessary expenses deductible from gross income by the petitioner in his individual tax returns. The respondent's action in disallowing the deduction is sustained. Cf. *Arthur H. Van Brunt*, 11 B. T. A. 406; *Alexander S. Browne*, 3 B. T. A. 826; *Louis Cohen*, 5 B. T. A. 171; *Fred W. Warner*, 5 B. T. A. 963; *Mitchel* v. *Bowers* (C. C. A.), 15 Fed. (2d) 287; certiorari denied, 273 U. S. 759.

The third point involved is the cost to the petitioner of two newspaper publishing businesses acquired by him in 1921 and 1922, and the cost of additions made during 1921, 1922, and 1923. The respondent disallowed any deduction for depreciation upon the ground of lack of evidence as to the cost. At the hearing it was stipulated that any depreciation allowable was at the rate of 10 per cent per annum upon depreciable properties. The petitioner and the respondent are now in agreement as to the bases for the computation of the depreciation and said amounts are shown in the findings of fact.

In his income-tax returns for 1922 and 1923 the petitioner failed to deduct from gross income $431,631.47 and $37,115.36, charged upon his individual books of account as "Promotion Expense," but upon the newspapers' books of account as ordinary and necessary expenses of operation. Items composing these expenditures are shown in our findings. The largest single item for 1922 represents the cost of gravure supplements and comic supplements purchased from publishers of the same. The cost of like supplements for 1923 was charged to expense and deducted as such on the petitioner's books of account. This item and all of the items charged to "Promotion Expense" in 1922, with the exception of the account "Promotion and Publicity," $38,792.84, appear to be ordinary operating expenses of the petitioner's newspaper business. The evidence indicates that the petitioner did not deduct these amounts upon his income-tax returns in order not to disclose to persons who would see the income-tax returns the disappointing results of his newspaper publishing business in the years 1922 and 1923. We are of the opinion that the petitioner was entitled to deduct from gross income of 1922 the entire amount charged to "Promotion Expense" except the $38,792.84 charged to "Promotion and Publicity." The character of this account is not fully explained. The petitioner resorted to billboard advertising and conducted contests for the purpose of increasing circulation. The petitioner offered no evidence as to whether he merely rented the billboards or whether he constructed them, and therefore the Board is unable to determine whether the $38,792.84 in question is a capital item or an expense item. Likewise, monies expended for premiums and prizes in a circulation contest are of a capital nature. *News Publishing Co.* v. *Blair*, 29 Fed. (2d) 955. Upon the evidence the disallowance of the deduction from gross income by the respondent of $38,792.84 for "Promotion and Publicity" for 1922 is sustained and likewise the disallowance of the $37,115.36 as a deduction from gross income for 1923.

The last point involved is the right of the petitioner to deduct from gross income $3,078.10 in connection with litigation over an

automobile which had been stolen from petitioner. Petitioner recovered the car and the person in whose possession the car was found was charged with the theft. The accused was aquitted and he brought suit against the petitioner for damages for malicious prosecution and false arrest. The $3,078.10 in question was paid by the petitioner in defending the action. It is claimed as a deduction from gross income on the ground either that it was a loss arising from the theft or a deductible expense in connection with petitioner's business.

The facts outlined appear to bring this case within the principles announced by the Board in *Sarah Backer et al., Executors*, 1 B. T. A. 214. In that case Backer paid money to prevent a strike among employees working on buildings being erected by him. He later testified before a state committee that he had not paid the money but before leaving the witness stand changed his testimony. He was charged with perjury but the jury disagreed and the case was dismissed. He claimed the right to deduct on his income-tax return the expense of his trial. The Board said:

> We are dealing here with the age-old question of proximate cause. If the charge of perjury proximately resulted from the business carried on by George Backer, it may be conceded that the expense of defense against that charge was an ordinary and necessary expense of carrying on his business. If, on the other hand, the business of contracting was not proximately related to the charge of perjury, then the cost of defense was not a business expense and may not be deducted as such in the taxpayer's income-tax return.

To the same effect see *Kornhauser* v. *United States*, 276 U. S. 145, wherein the court stated:

> In the *Appeal of F. Meyer & Brother Co.*, 4 B. T. A. 481, the Board of Tax Appeals held that a legal expenditure made in defending a suit for an accounting and damages resulting from an alleged patent infringement was deductible as a business expense.
>
> The basis of these holdings seems to be that where a suit or action against a taxpayer is directly connected with, or, as otherwise stated (*Appeal of Backer*, 1 B. T. A. 214, 216), proximately resulted from, his business, the expense incurred is a business expense within the meaning of section 214(a), subd. 1, of the act. These rulings seem to us to be sound and the principle upon which they rest covers the present case.

The petitioner's claim that the expense incurred in the litigation herein involved was a loss arising from the theft is far-fetched. All that was stolen from the petitioner was his automobile and that was later recovered. The claim that the amount paid is a business expense is likewise far-fetched. The facts indicate that the automobile was used to some extent in connection with the petitioner's business but the charge made by the petitioner against the person in whose possession the automobile was found that he was guilty of the theft had no near relationship to the petitioner's business.

Upon the record, the disallowance of the deduction by the respondent must be and is sustained.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

LANSDON dissents. 